IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2018 MAR 23   AM 9: 25

DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | NO. |
| RICKY DALE SORRELLS | 3 - 18CR - 1 6 9 - N |

## FACTUAL RESUME

In support of Ricky Dale Sorrells' plea of guilty to the offense in Count One of the Information, Sorrells, the defendant, Cynthia Barbare, the defendant's attorney, and the United States of America (the government) stipulate and agree to the following:

## ELEMENTS OF THE OFFENSE

To prove the offense alleged in Count One of the Information charging a violation of 18 U.S.C. § 1349, that is, conspiracy to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, the government must prove each of the following elements beyond a reasonable doubt:[1]

*First*:    That the defendant and at least one other person made an agreement to commit the crime of conspiracy to commit honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346, as charged in the Information;

*Second*:    That the defendant knew the unlawful purpose of the agreement; and

*Third*:    That the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose.

---

[1] *See United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014)

The elements of honest services wire fraud are as follows:

*First*:      That the defendant knowingly devised or intended to devise any scheme to defraud, as set forth in the Information;

*Second*:   That the scheme to defraud employed false material pretenses or omissions;

*Third*:     That the defendant transmitted or caused to be transmitted by way of wire communications, in interstate commerce, any writing, sign, signal, picture, or sound for the purpose of executing such scheme; and

*Fourth*:    That the defendant acted with a specific intent to defraud.[2]

## STIPULATED FACTS

1.      The defendant agrees that the following facts are true and correct and that his testimony at any trial would reflect the same.

2.      From in or around 2011 to in or around 2017, in the Dallas Division of the Northern District of Texas and elsewhere, the defendant, Sorrells, Person A, Slater Washburn Swartwood, Sr., and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Sections 1343 and 1346.

3.      Sorrells, at all relevant times, knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose.

---

[2] Fifth Circuit Pattern Jury Instructions (2015), 2.57.

4.      Before the conspiracy started and until March 2016, Sorrells served as the superintendent of Dallas County Schools (DCS).  DCS's primary responsibility was the operation of its school bus system, which transported children to and from school each day in various Texas school districts.

5.      As a result of his position, Sorrells was a public servant.  As superintendent, Sorrells had authority to enter into contracts on DCS's behalf that exceeded $50,000.  He also had the authority over purchasing, including the purchasing of bus-camera-equipment from Company A.

6.      Sorrells met Person A, the owner of Company A, in approximately 2009. Company A sold bus cameras.

7.      Around that time, DCS put out a request for proposal to put cameras in its school buses.  Although Company A submitted one of the highest bids, DCS ultimately chose them because their camera systems included stop arm cameras, which DCS viewed as a potential source of revenue.

8.      DCS and Company A entered into a Professional Services Agreement in the middle of 2010, under which DCS agreed to purchase between 100 and 150 bus-camera systems, just a fraction of the buses in its fleet.  The agreement contemplated additional camera purchases by DCS to outfit its entire fleet, but it did not set forth any specific terms, and it did not bind DCS to buy the cameras from Company A.

9.      Shortly thereafter, Person A told Sorrells that he was underpaid.  Person A told Sorrells that he could do research for him and that someone would pay him.  Person A instructed Sorrells to open a company, Allegro Research and Consulting (Allegro), in a

family member's name to receive the payments. The first payment corresponded with DCS's first purchase of cameras from Company A. The money was sent to Sorrells from a law firm, although Sorrells was fully aware that he was being paid by Person A. Subsequent payments to Allegro followed a similar pattern.

10.     Sorrells understood almost immediately that the "consulting" he was doing for Person A was merely a front, and that Person A was paying him to secure favorable official action for Company A, including the purchase of additional cameras. Despite doing only approximately 20 to 30 hours of internet research for Person A, Person A paid Sorrells, via the law firm, $50,000. Beyond this, Sorrells did no work—consulting or otherwise—for Person A or Company A for the remainder of the conspiracy.

11.     To conceal the true purpose of the payments, Person A created a fake Craigslist advertisement and told Sorrells to respond to it, after which a lawyer would be his contact. Sorrells, per Person A's advice, also communicated with Person A about Allegro using a family member's email address in order to separate himself from the bribe and kickback payments.

12.     To conceal the bribe and kickback payments, Person A also asked Sorrells to open a second shell company, Photon IT Product Development, Inc. (Photon). Sorrells had no experience in IT and did no work for Person A through Photon. Nonetheless, Person A provided Sorrells with a template to create a fake consulting agreement for Photon. Person A also instructed Sorrells to submit fake invoices for "consulting" work to disguise bribe and kickback payments, which Sorrells did on less than five occasions.

Thereafter, Person A stopped asking for invoices, but the payments to Sorrells through Photon continued. Sorrells signed Photon documents with the fake name "D. Brumbe."

13.     After creating Photon, Sorrells, on Person A's advice, created Sreig International (Sreig), a purported real estate referral company. Sorrells did not purchase real estate with, or make referrals using, Sreig; instead, the company was just another justification for Sorrells to receive disguised bribe and kickback payments from Person A. Swartwood and Person A created a few fake real estate referrals for Sreig to allegedly provide in exchange for payment.

14.     At some point, Person A told Sorrells that it would be safer and easier to get him money by paying off any debts that he had and asked Sorrells to provide his bills. Thereafter, Sorrells would hand Person A his credit card statements and Person A would pay the bills. Person A also paid Sorrells' student loan debt.

15.     When Sorrells was doing purported "consulting" work for Person A, he did not receive 1099s. This became an issue, after which Person A decided that all payments to Sorrells—including past payments which the coconspirators had characterized as consulting or referral fees—should be concealed as an alleged loan. The loan went through various iterations—secured by Sorrells' home, a personal note, a five-year balloon note, a bi-annual interest-only loan—but it was always a fake loan intended to disguise bribe and kickback payments that Person A made to Sorrells. According to Person A, the note had to be crystal clear and would wipe all prior payments out. Indeed, the coconspirators would often discuss having Sorrells make payments on the loan, but then have Person A recycle the money back to Sorrells.

16.     In total, Sorrells received over $3 million from Person A, which he spent on credit card debt, trips, personal expenses, an apartment in New Orleans, and cars and jewelry, including the cars and jewelry listed in the forfeiture notice of the Information. In return for these payments, Sorrells, on behalf of DCS, purchased millions of dollars worth of cameras from Company A, and entered into agreements, including a $25 million asset purchase/licensing agreement.

17.     Sorrells knew that he was taking bribes from Person A and Person A, in making payments to Sorrells, was absolutely trying to influence Sorrells' conduct as a public servant. Although the payments that Sorrells received came from various sources, including several companies associated with Swartwood, Sorrells was fully aware that all of the payments were made by Person A.

18.     Sorrells had no shell companies prior to meeting Person A. Person A was fully aware that Sorrells, as the superintendent of DCS, had great latitude over DCS's business and had the authority to enter into contracts and to purchase camera equipment. Person A understood Sorrells authority before he made the first bribe payment. Person A would often tell Sorrells that "we are pressing forward" with the camera program and then ask him whether he needed any money. Person A often reminded Sorrells of the payments he was providing in conjunction with DCS's decisions regarding Company A. If Sorrells put up any resistance to the purchase of additional cameras, Person A would tell Sorrells things like "Now I need your help and you aren't around" and "After all I have done for you, you've got to do this for me." Even though Company A performed poorly, Sorrells, on behalf of DCS, continued to do business with them because Sorrells

was getting paid. And there were decisions that Sorrells would not have made but for the payments that he was receiving from Person A.

19.     It was usually within a month after DCS made a payment to Company A that Sorrells would receive a kickback payment from Person A.

20.     The defendant agrees that the defendant committed all the essential elements of the offense(s). This factual resume is not intended to be a complete accounting of all the facts and events related to the offense charged in this case. The limited purpose of this statement of facts is to demonstrate that a factual basis exists to support the defendant's guilty plea to Count(s) One of the Information.

AGREED TO AND STIPULATED on this 7ᵗʰ day of _March_____, 201⅄.

ERIN NEALY COX
UNITED STATES ATTORNEY

_____
RICKY DALE SORRELLS
Defendant

_____
ANDREW O. WIRMANI
Assistant United States Attorney
Texas Bar No. 24052287
Dallas, Texas 75242-1699
Tel: (214) 659-8600
Fax: (214) 659-8809
Email: andrew.wirmani@usdoj.gov

_____
CYNTHIA BARBARE
Attorney for Defendant